

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-15-00104-CR**
**NO. 02-15-00105-CR**

DEDRIAN LEMOUR FREEMAN                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NOS. 1346518D, 1373250D

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Dedrian Lemour Freeman of burglary of a habitation and two counts of felony assault of a family member—one charged in a separate cause number—and upon his pleas of true to a repeat-offender notice in each indictment, assessed his punishment at forty years' confinement for the burglary conviction and twenty years' confinement for each conviction of felony

---

[1]*See* Tex. R. App. P. 47.4.

assault of a family member. The trial court sentenced him accordingly. In one point, Appellant contends that the trial court erred and violated his constitutional right to confrontation by restricting cross-examination, thereby excluding evidence that the complainant in the separately charged felony assault of a family member, S.J., was being held in jail on a material-witness bond. Because we hold that error, if any, was harmless, we affirm the trial court's judgments.

**Summary of Facts**

M.B., Appellant's former girlfriend, was the complainant in the burglary and felony assault of a family member charged in the same indictment. She testified that she and Appellant had remained friends after breaking up. On October 13, 2013, shortly after they broke up, they went out on a date and ended up at a club. M.B. wanted to leave and got a ride home with another man because Appellant did not want to leave. Appellant was not happy about that. After M.B. arrived home, her doorbell rang. M.B. did not answer the door because she thought it might be Appellant, who had told her earlier that he might drop by. She also turned her bedroom light off. Then she heard a window near the dining room being raised and its plastic window blinds making noise, turned her bedroom light back on, and saw Appellant running down the hall toward her. She testified that he hit her several times in the face and head, grabbed and pulled her by the hair, and threatened to kill her. She told the jury that he also "squeezed" her neck, choked her more than once, and "beat [her] up." M.B.

further testified that Appellant threw her against the glass mirror in her bedroom, and the mirror broke.

M.B. escaped and ran across the street to her neighbor C.J.'s house; C.J. was the grandmother of M.B.'s children. M.B. told C.J. that Appellant had "just jumped on" her.

M.B. testified that her kitchen window was usually screened and locked. After she returned home from the hospital on the evening of the assault, she found the blinds "kind of ruffled" and the window up. The window screen was lying in the grass. She testified that Appellant intentionally crawled through the window. She also testified that Appellant did not have her permission to be in her home.

M.B. admitted that at the time of trial, she did not like Appellant and would like to see something bad happen to him.

C.J. testified that she heard someone knocking on her bedroom window and pleading for help around 6:00 a.m. on the day of the assault. She recognized M.B.'s voice and answered the door. C.J. testified that M.B. was very distraught, scared, and shaking. C.J. saw that plugs of M.B.'s hair had been pulled out, she had knots and scratches on her face and head, "and her nose was bleeding just a little." M.B. asked C.J. to call M.B.'s mother. M.B. told C.J. that Appellant had "beat her up." C.J. told the jury that M.B. had not told her anything about having her hair pulled but had told her that Appellant had pulled

3

her down a hallway. C.J. put a robe over M.B., placed her on the couch, and called the police because M.B. "had been abused" and "was afraid."

Fort Worth police detective Gary Hawley testified that he would usually keep a note of visible injuries, did not make a note regarding visible injuries in this case, and could not remember whether he saw bruising on M.B. when he interviewed her in person two days after the incident.

S.J. was the other complainant, and Appellant had been convicted of assaulting her in the past. S.J. had been subpoenaed by the State to testify and placed in jail on a material-witness hold. Outside the presence of the jury, the State asked for the "opportunity to have [S.J.] put into some clothes that her family . . . brought for her." The trial court granted that request, and Appellant did not object, nor did he object when the trial court allowed S.J. to take the witness stand outside the presence of the jurors so they would not see her coming from the holdover cell.

S.J. testified that she had dated Appellant off and on from 2009 through June 8, 2014. She told the jury that when she and Appellant were on a three-month break, he began dating M.B. She also testified that when he was not living with her, she had known that he was living with M.B.

On the night of June 8, 2014, S.J. had a girls' night out before retiring to the home of Appellant's brother's girlfriend. Appellant woke her up, looked through the call history on her phone, and called someone. Then he and S.J. began arguing. She testified that he hit her in the back of her head and hit her in

4

the face with his fist three or four times. Three of her children were in the apartment at the time. She gathered her children and walked out of the apartment. Appellant followed the family in his car. S.J. testified that the police drove up while she and her children were walking and asked if Appellant had hit her. She told them that he had. She stated that she later learned that her son had called 911, and he confirmed in his testimony that he had seen Appellant hitting her and had called 911 while still in the apartment.

Officer Gregory Stanley testified that he approached the people walking alongside the car and asked them what was going on. Officer Stanley stated that S.J. told him that Appellant had assaulted her, and he also told the jury that her son's story of the assault was consistent with S.J.'s. Officer Stanley testified that S.J. had been "very upset." "Her eyes were red and watery. It appeared that she had been crying." He also testified that he noticed some swelling and puffiness on her right cheek "consistent with an assault."

S.J. admitted that she had a criminal history, and defense counsel cross-examined her extensively about her criminal record, which included two convictions of theft by check, one conviction for theft of property, one conviction for possession of less than a gram of cocaine, an arrest and a different conviction for driving with an invalid license, and two convictions for possession of marihuana. Defense counsel attempted to question S.J. about her current confinement in jail on a material-witness hold, arguing that this evidence was relevant to show possible bias on her part. The trial court excluded the evidence.

5

Appellant testified that he lived with M.B. at the time of the alleged offenses naming her as the complainant but that he was not on the lease because the home was Section 8 government housing, and she could not have anyone living there with her. He agreed that M.B. never gave him a key to the home but stated that they shared the key. He denied that he went back to her home after their evening out on October 13, 2013, and claimed that he instead went to S.J.'s home. He denied committing the burglary and both assaults.

**Exclusion of Evidence and Restriction of Cross-Examination**

In his sole point, Appellant contends that the trial court erred by excluding evidence that S.J. was in jail as a material witness, which would have shown her possible bias. He contends that the trial court's preventing him from showing S.J.'s motivation to testify the way she testified violated his constitutional rights to confrontation and cross-examination and was harmful:

> The argument is that [S.J.] was placed in a position that if she did not testify, and testify perhaps in the manner desired by the State, she would remain incarcerated. This motivation, however substantial or slight[,] had the potential of influencing the testimony of a witness that likely did not wish to testify.
>
> . . . .
>
> When subpoenaed to testify at a trial, a witness who may have provide[d] false evidence to law enforcement might be reluctant to appear and testify at risk of being exposed and thus dishonor their subpoena. When the process is implemented to incarcerate this reluctant witness, a motivation is set in place for the witness to testify in a manner consistent with the previous false evidence provided on the hopes that this strategy will more assuredly result in freedom from confinement.

6

Defense counsel tried to elicit the information from S.J. on cross-examination,

> [Defense Counsel]: [S.J.], where did you sleep last night?

> [Prosecutor]: I'll object to relevance, Your Honor.

> THE COURT: Sustained.

> Q. [Defense Counsel]: [S.J.], are you currently under a bond?

> [Prosecutor]: Your Honor, I object again to relevance.

> THE COURT: Sustained.

> Q. [Defense Counsel]: Are you currently in jail?

> [Prosecutor]: Objection, Your Honor. . . . [W]e object to relevance three times, and he persists in going into it. We ask that the jury be instructed to disregard Counsel's last remark, and we ask that Counsel be admonished to stop trying to go down this path.

> [Defense Counsel]: Your Honor, I believe it is relevant, and it's relevant for several reasons. But if you'd prefer, I will not state those in front of the jury.

> THE COURT: Please. Let's come up.

> (BENCH CONFERENCE PROCEEDINGS)

> [Defense Counsel]: Judge, I believe it's relevant as to giving her a motive to falsify that she was placed in custody at the request of the State with a $50,000 witness bond and was maintained in custody. And basically I believe the jury is entitled to know that that could affect her testimony as to the way she's testifying. It gives a motive and a bias.

> THE COURT: And how is that a motive?

> [Defense Counsel]: The only way she's going to get out of jail on that witness bond is to get up here and testify.

7

THE COURT: That's not true.

[Defense Counsel]: I believe we're entitled to explore that with the jury.

THE COURT: Denied.

I'm sorry. Did you have anything you wanted to add?

[Defense Counsel]: No, Judge.

THE COURT: All right. Denied.

[Defense Counsel]: . . . [B]efore we close the case, could I make a bill?

THE COURT: You may.

. . . .

(OPEN COURT PROCEEDINGS)

. . . .

[Defense Counsel]: [S.J.], with regards to the convictions that you have admitted, the last one shows a disposition date on the 19th of this month of this year. What did you have to do to get that disposition?

[Prosecutor]: I'll object again to relevance. The fact that it exists is already in front of the jury.

THE COURT: I'm sorry. I didn't quite understand the question. Could you restate your question?

. . . .

Q. [Defense Counsel]: Okay. [S.J.], with regards to the last conviction that you have that you admitted to, it shows a disposition date of March the 19th, 2015, which was a couple of three, four days ago, maybe five. I'm losing track. What did you agree to in order to get that disposition from the State?

8

[Prosecutor]: And I object to that. It is not relevant. The fact that she has a conviction is what's impeachable. That's already in front of the jury. In fact, it's [in] front of the jury twice.

THE COURT: Okay. Counsel, if you rephrase your question to articulate whether or not there was any benefit would perhaps be better. I'm going to sustain the objection.

. . . .

Q. [Defense Counsel]: [S.J.], what kind of agreement did you have and what benefit did you get from that agreement in regards to the conviction that was disposed of on March the 19th of 2015?

A. That's the . . . that's the check that I told you I paid for.

Q. Okay. And did you work that agreement out with members of the Prosecutor's office?

A. No, sir. I was working, and I paid that check off with my paycheck from my job.

Q. Okay. And the payment was made to the District Attorney's Office?

A. Yes, sir.

Q. Okay. And in return for making that payment, what was your agreed-to sentence in that case?

[Prosecutor]: Your Honor, I'm going to continue to object to relevance. We have disclosed no deal, there is no deal, so I—

THE COURT: What's your legal objection?

[Prosecutor]: Object to relevance.

THE COURT: Okay. Please move on . . . .

[Defense Counsel]: Yes, sir. We'll add that to our bill if it's all right with the Court.

THE COURT: She's already answered the question, Counsel.

[Defense Counsel]: Yes, sir.

After both sides indicated that they did not have any more questions for S.J. and that they did not intend to call her back, the trial court sent the jury to the jury room, and the following occurred:

> THE COURT: All right. Now, gentlemen, I intend on excusing or releasing [S.J.] from the bond.
>
> [Defense Counsel]: Okay.
>
> [Prosecutor]: State has no objection.
>
> THE COURT: Do you . . . intend to call her back? If you do, I need to instruct her and admonish her.
>
> [Defense Counsel]: Judge, in light of the . . . Court's rulings and our obedience to those, we would have no further questions for her.
>
>  . . . .
>
> THE COURT: I'm sorry. You're not going to qualify it, but you're going to simply tell me do you wish to have her or not.
>
> [Defense Counsel]: We don't need her, Judge.
>
> THE COURT: Thank you very much. [S.J.], I will be lifting the bond. You'll be excused. Thank you very much.
>
> THE WITNESS: Thank you, sir.

S.J. testified before Appellant's proffer. He agreed to her final release as a witness. She was therefore not part of the proffer. In Appellant's proffer, defense counsel stated,

> [S.J.] had previously been sworn as a witness. She was contacted by members of the State on two different occasions, I believe, in connection with the call of this case for hearing and had been advised that it was not necessary for her to appear.

10

Eventually it was necessary for her to appear, and as a result of that occurrence or non-occurrence, the State requested and she was placed under a $50,000 witness bond is what I was advised by the Prosecution. We would make a proffer of that proof.

Furthermore, we would have offered before the jury that she, in fact, was in custody and not released on bond prior to her testimony and at the time of her testimony.

I'd like to point out in our bill that when she appeared before the jury, she was not in Tarrant County jail garb but in civilian clothing, so that we believe that those matters would have been important to show bias or motive for her to testify a particular way so that she could get out from underneath being in custody; would explain what we would believe to be a fabrication of her testimony and an influence upon her testimony.

We understood that the Court overruled our request. In light of that, we obeyed the Court's orders and did not go into those matters, and we would like to have those matters contained in this record as an offer of proof by Counsel, that being me, as indicated to the Court.

THE COURT: All right. Let me ask a couple of questions.

[Defense Counsel]: Yes, sir.

THE COURT: Was she being held on a final conviction of any kind?

[Defense Counsel]: Judge, the information I have from the State is that she had been convicted on the 19th of this month just a few days before. I don't know what the specific details, whether she got credit for time served, labor detail. I don't know the answer to that specific question. But the records indicate a final conviction of some sort.

THE COURT: But you covered the final convictions during cross-examination, correct?

[Defense Counsel]: I did.

THE COURT: In fact, that's what's contained in now—in the exhibit that you wanted to have offered. You reviewed all those exhibits. In fact, you've offered the final Judgment and Sentences

and in detail impeached her on every one of those matters, including some that were not crimes of moral turpitude but they were done within ten years—or ten years of a crime of moral turpitude. Thereby, you were allowed to go into those matters, correct?

[Defense Counsel]: Yes, sir.

THE COURT: All right. Now, in addition to that is that you did ask for leave of the Court to question her on the matters with regard to why she was being detained on a writ because she failed to appear and there was an attachment made by the State. Now, in my understanding, that is not a crime. That is a civil matter. Isn't that correct?

[Defense Counsel]: That—yes, Your Honor.

THE COURT: Okay. Now, is there any case law or any law that you would like me to review in reconsideration of the Court's previous ruling—

[Defense Counsel]: I think—

THE COURT:—that you could be able to cross-examine a person under Rule 608?

Now, I remind you 608 specifically states specific instances of conduct, and it states specific instances of conduct of a witness for purposes of attacking or supporting the witness' credibility other than the crimes as provided in 609 may not be inquired into on cross-examination of a witness or provide any—by any extrinsic evidence.

And the Court relied on 608 specifically because that is, one, not a crime, as we both discussed. Secondly is that under 608, it goes to a specific act, which is prohibited under the Texas Rules of Evidence. And, therefore, I'm asking do you have any authority for me to review and consider in reconsideration of the Court's previous ruling?

[Defense Counsel]: The answer is yes with a qualification.

THE COURT: I'm asking you about 608 first.

[Defense Counsel]: Well, 608 doesn't even cover what we're talking about.

THE COURT: Yes, it does in my opinion. And I asked for a response with regard to the law regarding . . . 608.

[Defense Counsel]: I don't think the Judge understands what we're trying to—

THE COURT: Just answer my question. We're arguing.

[Defense Counsel]: I'm really trying not to argue. 608, I have no law on 608.

THE COURT: Thank you.

[Defense Counsel]: But I'd like to point out to the Court that we're trying to show, because she was in custody, because she was in a bond, because she was under a writ of attachment, matters which would affect bias or motive to fabricate, which is not under 608.

That's what we were trying to get at.

THE COURT: Isn't it a consistent—a bad act of one kind or another that you're—you're trying to get into? You're trying to say that she was lying, correct?

[Defense Counsel]: We're saying that she had a bias or motive to fabricate, yes.

THE COURT: Okay. And that she's previously been adjudicated by other cases in Tarrant County involving crimes of moral turpitude. That already came out, correct?

[Defense Counsel]: Right.

THE COURT: In addition to it, you have not been able to establish any nexus between her testimony and the matter that held her here as far as you can tell me now.

[Defense Counsel]: With the state of the record the way it is, the answer is yes. We were trying to get into those matters.

THE COURT: All right. And I considered what you said in the record, and I disagree. So the Court's previous rulings still stand.

[Defense Counsel]: That's fine. I just wanted to put on the record why we were doing that and what the purpose was so that

13

whoever looks at this thing later on will know what we were talking about.

THE COURT: All right. Thank you very much.

State, do you have a response and for the record any law that you may have?

[Prosecutor]: No law. We do want to point out that that may be their contention, that she lied, but I do not recall them asking a single question of her about the facts of the case.

So if that was their intent to uncover some sort of different story or falsehoods regarding the case itself, they asked about the priors, about prior assaults. They did not ask a single question about the actual assault on June 8th of 2014. So I think that goes against their—what they just stated on the record.

THE COURT: All right. And if either of you have any case law for me to reconsider, please provide it to me.

Later, the trial court revisited the issue,

And after considering the—the objection, the proffer and reviewed—read the case law in the consideration of a *Crawford* objection under a Sixth Amendment claim, the Court continues to persist in its decision to limit the cross-examination with regard to the status of the—the victim being held over for the purposes of testifying and that those matters were not allowed in the presence of the jury.

And the reason for that is on the basis that under a Sixth Amendment analysis of *Crawford* type objection or—and its corollary cases in the state courts is that in the previous cases that were decided, the State of Texas relied on excited utterances and usage of the Rules of Evidence to provide evidence in support of a finding of guilt that the Defendant was precluded from being able to cross-examine that particular person.

Under this particular circumstance, the victim was present and testified and was impeached. And the purposes of the information to have that brought forth before the jury that was presented in the proffer was for purposes of cross-examination and impeachment only.

14

Accordingly, there is no breach or limitation of the Defense to cross-examine the witness and confront them—that—on the facts of the case. That is not material. . . . [T]hose matters were impeachment purposes only in the Court's opinion.

The Defendant was able to cross-examine the—the victim on the basis of what took place on that date, also was able to impeach [S.J.] on a number of occasions, in multitude of different ways and also brought out the inconsistencies of what took place on that date.

. . . .

[Defense Counsel]: Yes, Judge. We're not—we respectfully disagree with the Court's analysis as to the cross-examination points. However, there is a second part of that that's confrontation, which is a separate analysis.

And we were contending also that there was not effective confrontation because we were not allowed to present before the jury the fact that the witness was currently incarcerated for failing to make a $50,000 witness bond. And I believe, if the Court could make some findings on that—

THE COURT: Well, I did make a finding. The specific finding was yesterday that . . . [S.J.], even though she had a witness bond, that is not a criminal offense. Under 608, 609 it's not a final conviction.

Under *Crawford*, the excited utterance, which was an exception to the hearsay example, was . . . the basis for the State to be able to prove their case beyond a reasonable doubt, and there was no ability to cross-examine the witness—the victim in that situation and therefore deprived the Defendant in that case of their Sixth Amendment right.

That did not occur. The Defense vigorously cross-examined [S.J.], impeached her . . . on a number of fronts including not only inconsistencies of what she testified to, what the officers had in addition to the reporting, and furthermore, on her crime of moral turpitude. And he went beyond even that. Also included DWLI, for example.

15

Therefore, the notion that there was no . . . effective cross-examination, that is not the Court's conclusion or finding.

Now, the limitation was for a civil matter, and she did testify voluntarily. Her appearance was compelled. She could have taken the stand and decided not to testify or not answer any questions. She voluntarily testified in that regard, and that is not misleading to the jury.

So the matter with regard to a final conviction, a crime of moral turpitude w[as] observed, the matter with regard to what the Defense wants to go into has to do with something that is a civil matter, and that is having a writ of attachment. So—

[Defense Counsel]: Judge—

THE COURT: That will be the Court's findings and rationale.

[Defense Counsel]: I just—I just have one other thing I'd like for the Court to note. When she testified, she did not testify in jail clothing. She testified dressed out in standard civilian clothing—

THE COURT: That is—

[Defense Counsel]:—for a female.

THE COURT: And that is true. The Court, upon the request of the State, allowed her to dress in civilian clothes and kept the fact that she was not in custody. However, the record will reflect you still asked those matters in the presence of the jury, and there was an objection that was drawn.

So the jury did hear ultimately and could infer as a result of what the questions were that fact as well.

To the extent that Appellant complains in his issue that the trial court assisted "the system . . . [in] engag[ing] in actions to deceive the jury from learning of [S.J.'s] true status by permitting her to be outfitted in an appropriated costume to pass her off as in a normal witness status," Appellant did not timely

16

object to the trial court's granting the State's request that S.J. be allowed to wear street clothes and be allowed to take her place in the witness box outside the jury's presence. He has therefore not preserved error, if any, regarding the trial court's allowing S.J. to wear street clothes and preventing the jury from seeing S.J. treated as a prisoner.[2]

Further, there is no indication that Appellant complained in the trial court of violations to his rights under the state constitution or that the trial court understood Appellant's complaints to reference those rights. Consequently, Appellant did not preserve error, if any, regarding his claims under Article I, section 10 of the state constitution.[3]

As to the remainder of Appellant's complaint, the Texas Court of Criminal Appeals recently reiterated,

> An argument that evidence should have been admitted because it was offered to attack the credibility of the complainant may involve both the Confrontation Clause and the Rules of Evidence. The Sixth Amendment provides that "(i)n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The main purpose behind the Confrontation Clause is to secure for the opposing party the opportunity of cross-examination because that is "the principal means by which the believability of a witness and the truth of his testimony are tested." Although the facts of this case are distinguishable from those in *Davis v. Alaska*, *Davis* embodies a

---

[2]*See* Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016); *Sanchez v. State*, 418 S.W.3d 302, 306 (Tex. App.—Fort Worth 2013, pet. ref'd).

[3]*See* Tex. R. App. P. 33.1(a)(1); *Douds*, 472 S.W.3d at 674; *Sanchez*, 418 S.W.3d at 306.

forceful delineation of a defendant's right to cross-examine a prosecution witness to establish bias or motive. "(J)urors (are) entitled to have the benefit of the defense theory before them so that they (can) make an informed judgment as to the weight to place on (the witness') testimony."

As this court held in *Hammer v. State*, the Sixth Amendment right to cross-examine a witness allows a party to attack the general credibility of that witness "or to show their possible bias, self-interest, or motives in testifying." A trial judge can abuse his or her discretion by excluding admissible evidence that is offered by the defendant to demonstrate the complainant's motive to falsely accuse him . . . .

. . . . The Fifth Circuit has added . . . that until it can be "determine(d) that the cross examination satisfied the Sixth Amendment, the (trial) court's discretion" simply "does not come into play." This qualification of a trial court's discretion to limit cross-examination for bias appropriately accounts for the fact that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination(,)" and is "always relevant as discrediting the witness and affecting the weight of his testimony."[4]

Appellant wanted to question S.J. about her incarceration as a material witness to show her motive to fabricate her testimony. We are therefore not prepared to hold that the trial court did not err by excluding the evidence that S.J. was being held in jail as a material witness in Appellant's trial. But even if the trial court erred by disallowing such evidence, such error was harmless.

For constitutional error,[5] we apply rule 44.2(a) and reverse the trial court's judgment unless we determine beyond a reasonable doubt that any error was

---

[4]*Johnson v. State*, No. PD-1496-14, 2016 WL 3017842, at *10–11 (Tex. Crim. App. May 25, 2016) (footnotes omitted).

[5]*See Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010) (holding Confrontational Clause error subject to constitutional harm analysis).

harmless, that is, that it did not contribute to an appellant's conviction or punishment.[6]   In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the identified constitutional error might have contributed to the conviction.[7]

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence.[8]   We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error.[9]   This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most

---

[6]Tex. R. App. P. 44.2(a); *see Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997).

[7]*Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

[8]*Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).

[9]*Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)).

favorable to the prosecution."[10]

Because this case concerns constitutional error based on the exclusion of evidence in violation of the Sixth Amendment's Confrontation Clause, we also examine factors including the importance of S.J.'s testimony to the State's case, whether her testimony was cumulative, the presence or absence of evidence corroborating or contradicting her testimony on material issues, the extent of cross-examination allowed, and the overall strength of the State's case.[11]

As far as the assault of M.B. is concerned, there is no indication in the record that the exclusion of S.J.'s testimony regarding her incarceration as a material witness had any effect on Appellant's conviction and punishment. Similarly, regarding the burglary of M.B.'s home, S.J.'s admitted testimony that Appellant lived with M.B. when he was not living with her actually helped the defense by supporting the defensive theory that there could be no burglary because Appellant had a right to be in M.B.'s home. Thus, the exclusion of evidence attacking S.J.'s credibility either had no effect on the burglary conviction or helped the defense's case.

Focusing on the case in which S.J. was the complainant, in addition to her own testimony, the State presented photographs of the injuries to her face; the

---

[10] *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22.

[11] *See Snowden*, 353 S.W.3d at 822 n.31 (relying on *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986)).

testimony of her son, who witnessed the assault and called 911; and the testimony of the responding officer, who saw that she was very upset, noticed that her right cheek was swollen and puffy, and testified that the condition of her cheek was "consistent with an assault." Appellant's testimony was the only evidence contradicting S.J.'s testimony.

The excluded evidence might have revealed a particular motive to lie, depending on the questions the defense might have asked S.J. and her possible answers. But because Appellant chose not to question S.J. in his offer of proof, the record, as the trial court pointed out, does not "establish any nexus between her testimony" and her incarceration. Further, as the trial court recognized, Appellant cross-examined S.J. vigorously on her criminal history, showing where her original answers differed from the documentary evidence of her arrests, convictions, and sentences, and some of her convictions were for crimes of moral turpitude.[12] Thus, even without the evidence of her incarceration at trial, apparently for failing to appear to testify for the State, the defense was able to damage S.J.'s credibility in the jury's eyes.

After carefully reviewing the record and performing the required harm analysis under rule 44.2(a) and *Van Arsdall*, we hold beyond a reasonable doubt

---

[12]*See* Tex. R. Evid. 609(a)(1) (providing that "[e]vidence of a criminal conviction offered to attack a witness's character for truthfulness must be admitted if . . . the crime was a felony or involved moral turpitude, regardless of punishment"); *Ex parte De Los Reyes*, 392 S.W.3d 675, 676 (Tex. Crim. App. 2013) (stating that theft is a crime of moral turpitude); *Arambula v. State*, 133 Tex. Crim. 474, 475, 112 S.W.2d 737, 737 (1938) (same).

that the trial court's error, if any, did not contribute to Appellant's convictions or punishment.[13] We therefore overrule his sole point.

**Conclusion**

Having overruled Appellant's sole point, we affirm the trial court's judgments.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 16, 2016

---

[13]*See* Tex. R. App. P. 44.2(a); *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438.